## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MDU Barnett Limited Partnership, *et al.*, | § | |
|     *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action H-12-2528 |
| | § | |
| Chesapeake Exploration Limited | § | |
| Partnership, *et al.*, | § | |
|     *Defendants*. | § | |

### Memorandum Opinion & Order

Pending before the court is a motion to dismiss the claims of plaintiffs MDU Barnett Limited Partnership ("MDU") and Oil & Gas Working Interests, L.P. ("O&G") (collectively, the "plaintiffs") filed by defendants Chesapeake Exploration, LLC ("CELLC") and Chesapeake Operating, Inc. ("COI") (collectively, the "defendants"). Dkt. 51. After considering the live complaint and exhibits,[1] motion, response, reply, and applicable law, the defendants' motion to dismiss (Dkt. 51) is **GRANTED IN PART & DENIED IN PART**.

### I. Background

On March 1, 2005, Chesapeake Exploration Limited Partnership ("CELP") and Conglomerate Gas II LP ("CG") entered into an Exploration and Development ("E&D Agreement"). Dkt. 49 (second amended complaint) at 3–4 ¶ 10; Dkt. 49, Ex. 1 (E&D Agreement) at 1. CG offered CELP the exclusive option to purchase CG's oil and gas interests for a period of three years

---

[1] In considering a motion to dismiss under Rule 12(b)(6), the district court primarily considers the allegations of the live complaint, but there are other documents the court may consider. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499 (2007). These documents include items subject to judicial notice, matters of public record, and exhibits attached to the complaint whose authenticity is not in issue. *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 & n.13 (5th Cir. 2007); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

anywhere in the "Barnett Shale Prospect Area."[2]  Dkt. 49, Ex. 1 at 1 § II.  CG retained a working interest in every property that CELP accepted, and thereafter the parties created "Exploration and Development Areas encompassing the subject Oil and Gas Interests for the purpose of drilling exploration and/or development wells."  *Id.* at 3 § 6.1.  CELP agreed to explore and develop these areas under the E&D Agreement and a modified A.A.P.L. Form 610-1982 Model Form Operating Agreement attached as Exhibit B to the E&D Agreement.  *Id.* at 3–5 §§ 6.2–6.4, 7.  The parties agreed that a separate operating agreement would cover each Exploration and Development Area.

*Id.* at 5 § VII.  Section 7 of the E&D Agreement further defines the parties' relationship as follows:

[CELP] shall be designated Operator under all such Operating Agreements and shall have exclusive authority and control over leasing, drilling and other activities in an Exploration and Development Area once established by the parties, except as otherwise provided in said Operating Agreements. As designated Operator, [CELP] shall provide CG with drilling reports (including daily and cumulative well costs), logs, cores, tests and any and all information gathered from the well bore, contemporaneously as produced, both electronically (when available) and in print form.  Until such separate, but identical, operating agreements can be executed for each Exploration and Development Area, the operating agreement attached hereto will govern each proposed well.  In the event of a conflict between this Agreement and the Operating Agreement, the terms of this Agreement shall control.  After termination of this agreement, each separate operating agreement so executed shall stand independent of each other and apply to all wells drilled hereunder.

*Id.*  The E&D Agreement set a termination date of March 1, 2008, "unless terminated at an earlier date pursuant to the terms hereof or by mutual agreement of all parties hereto."  *Id.* at 1 § III.

---

[2] The parties defined the Barnett Shale Prospect Area to include thirteen counties in north Texas, namely Bosque, Denton, Ellis, Erath, Hamilton, Hood, Jack, Johnson, Palo Pinto, Parker, Somervell, Tarrant, and Wise Counties. Dkt. 49, Ex. 1 at 1 § II.  The Barnett Shale (designated as the Newark, East Field by the Texas Railroad Commission) is a hydrocarbon-producing geological formation covering more than 5,000 square miles in north Texas.  *See Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 31–32 (Tex. 2008) (Willett, J., concurring).  The Barnett Shale was long thought to be an uneconomic, or marginally economic, field because of its seemingly impermeable shale, but recent innovations in horizontal drilling and hydraulic fracturing have turned the area into "one of the most prolific natural gas fields in the continental United States."  *Id.* at 32 (quoting a Railroad Commissioner as referring to the field as the "shining star" of energy production success stories); Clifford Krauss, *There's Gas in Those Hills*, N.Y. TIMES, Apr. 8, 2008, at C1.  The Railroad Commission reports that since 2010, more than 5 billion cubic feet of natural gas per day have been produced from wells in the Barnett Shale area.  Railroad Commission of Texas, Barnett Shale Information, *available at* http://www.rrc.state.tx.us/barnettshale/NewarkEastField_1993-2013.pdf (last visited February 13, 2014).

The Operating Agreement also contained its own conflicts provision, consistent with the conflicts language of the E&D Agreement, specifying that "[t]o the extent there are any conflicts or inconsistencies between this Operating Agreement and the subject Exploration and Development Agreement, the terms of the Exploration and Development Agreement shall control." *Id.* at 28 § XV(H). Further, the Operating Agreement "is subject to and incorporates by reference all terms and provisions of that certain Exploration and Development Agreement between these same parties dated effective March 1, 2005." *Id.*

CELP was designated as the sole operator and had full control of all operations on the contract area. *Id.* at 16 § V(A). CELP also agreed to conduct operations "in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct." *Id.* The liability between the parties was further limited by Section 7(A), which imposed several, not joint, liability for the parties and also confirmed that "[i]t is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners." *Id.* at 21 § VII(A).

In June 2007, CELP was merged into defendant CELLC, which succeeded CELP's rights and obligations under its existing contracts. Dkt. 49 at 5 ¶ 17. Defendant COI currently operates the properties upon which the working interests remain. *Id.* On the plaintiffs' side, CG assigned certain wellbore interests to Oro Financial, Inc. ("Oro") in June 2008 as part of a case settlement. *Id.* at 5 ¶ 18. Oro then conveyed these interests to plaintiffs MDU and O&G. *Id.* Plaintiffs admittedly bought the wellbore interests with the intent to sell them. *Id.* at 6 ¶ 21. To this end, they sought development information and acreage maps from the defendants, which plaintiffs claim they were

entitled to receive under the relevant agreements. *Id.* at 6 ¶¶ 21–22. Plaintiffs allege that defendants either failed to provide this information or provided untimely and inaccurate data, as the value of their wellbore interests diminished when natural gas prices plummeted in late 2008 and 2009. *Id.* at 6 ¶ 23. Plaintiffs ultimately mapped the acreage themselves, at a cost of $12,000. *Id.* at 6 ¶ 22. Plaintiffs further requested a statement of revenues and expenses in 2008, but they did not receive them from defendants until June 2009. *Id.* at 6–7 ¶ 24.

After evaluating defendants' operations, plaintiffs executed "look-back" elections to participate in additional wells. *Id.* at 7 ¶ 25. Plaintiffs followed the Operating Agreement's procedures by timely and properly executing upon the majority of look-back elections on every well with monies submitted to defendants within the five-day window. *Id.* Plaintiffs allege that they did not receive credit for the look-back elections for a period of three months. *Id.*

In addition to being underpaid, plaintiffs contend that their production payments were subject to charges to which they did not agree. *Id.* at 8–9 ¶¶ 27–28. Specifically, plaintiffs contend defendants assessed a minimum production charge corresponding to a volumetric production payment credit facility that defendants entered for its overall Barnett Shale production. *Id.* at 9 ¶ 28. Plaintiffs allege that they do not benefit from this facility and have not agreed to any resultant reductions in their production payments. *Id.* Lastly, plaintiffs contend that defendants have frequently submitted joint-interest billing statements ("JIBs")[3] to plaintiffs that contain multiple errors that are generally in defendants' favor. *Id.* at 10 ¶ 30. Plaintiffs argue that these errors, which were not corrected despite repeated requests, made their wellbore interests unmarketable. *Id.* at

---

[3] Under the Operating Agreement, the Operator sends monthly bills to non-operators for their proportionate share of costs for operations on the Contract Area. *See* Dkt. 49, Ex. C (COPAS accounting procedure for joint operations) to Ex. 1. These bills are often referred to as joint-interest billing statements or JIBs. *See Stable Energy, L.P. v. Kachina Oil & Gas, Inc.*, 52 S.W.3d 327, 330 (Tex. App.—Austin 2001, no pet.).

10–11 ¶ 30.  Plaintiffs allege that a reasonable buyer of plaintiffs' interests "would require accurate information and check the information provided by the Defendants[] against the data reported to the Texas Railroad Commission."  *Id.* at 11 ¶ 30.

Plaintiffs allege that the provision of inaccurate or incomplete data, which caused losses in the form of underpayments, unnecessary out-of-pocket expenses, and impairment of marketability of the wellbore interests, was committed negligently, knowingly, and/or intentionally.  *Id.* at 11–13 ¶ 31.  Lastly, plaintiffs allege that defendants discriminated against them in the provision of data, as defendants provided certain reserve reports to an executive officer and working interest holder, Aubrey McClendon, while depriving them of those same reports.  *Id.* at 10 ¶ 29.

## II. Legal Standard

For most causes of action, Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that the pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A party against whom claims are asserted may move to dismiss those claims when the nonmovant has failed "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "'enough facts to state a claim to relief that is plausible on its face.'"  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955 (2007)).  "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555 (citations omitted).  While the allegations need not be overly detailed, a plaintiff's pleading must still provide the grounds of his entitlement to relief, which "requires more than labels and conclusions," and "a formulaic recitation of the elements of a cause

5

of action will not do." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009) ("[N]aked assertions devoid of further factual enhancement," along with "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the presumption of truth) (internal quotation marks omitted). "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Evaluating a motion to dismiss is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Moreover, if a party's claim contains allegations of fraud, the pleading must meet a heightened standard and "state with particularity the circumstances constituting fraud ." FED. R. CIV. P. 9(b); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (noting that Rule 9(b) does not "supplant" Rule 8(a)). This particularity requirement "does not 'reflect a subscription to fact pleading.'" *Kanneganti*, 565 F.3d at 186 (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)). Instead, pleadings alleging fraud must contain "simple, concise, and direct allegations of the circumstances constituting fraud, which . . . must make relief plausible, not merely conceivable, when taken as true." *Id.* (referring to the *Twombly* standard).

## III. ANALYSIS

Plaintiffs assert the following claims: (1) negligence and negligent misrepresentation; (2) fraud; (3) breach of fiduciary duty; (4) equitable accounting; (5) gross negligence/willful

misconduct; and (6) breach of contract.  Dkt. 49.  Defendants moved to dismiss the complaint, Dkt. 51, and the court will consider defendants' dismissal arguments as to each claim in turn.

### A.       The Negligence Claims

Plaintiffs allege that defendants negligently deprived them of well information and financial payments which they were owed, and, assuming that the E&D agreement does not govern their relationship, misrepresented the fact that the E&D Agreement still applied.  Dkt. 49 at 16 ¶¶ 38–40. Defendants argue that dismissal is appropriate because the duties underlying the plaintiffs' tort claims are contractual in nature and cannot proceed under Texas's economic-loss rule.  Dkt. 51 at 10–11.  The court agrees with the defendants.

Under Texas law, when counterparties enter into a contract, their relationship may be governed by contract and tort law.  *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986).  Whether an action sounds in contract or tort is generally based on the nature of the plaintiff's alleged injury.  *Id.*  If the injury flows from the economic loss to the subject of a contract itself, rather than as a result of the breach of a duty created by law, the action sounds in contract alone.  *Id.*; *Mid-Continent Aircraft Corp. v. Curry Cnty. Spraying Serv.*, 572 S.W.2d 308, 312 (Tex. 1978).

First, the plaintiffs have alleged only economic damages related to the parties' contracts.  The damages can be subdivided into out-of-pocket, benefit-of-the-bargain, and impairment of vendibility (marketability) losses.  All of these damages allegedly arose out of the defendants' failure to perform their contractual obligations, and thus the plaintiffs' negligence claims may not proceed.

Second, as to the alleged misrepresentations regarding the viability of the E&D Agreement, plaintiffs have merely stated that they justifiably relied on the representations and were damaged. Dkt. 49 at 16 ¶ 40.  This conclusory allegation is not entitled to the presumption of truth and is

insufficient to support a claim for negligent misrepresentation.  *Twombly*, 550 U.S. at 555 (holding that a pleading does not pass muster under Rule 8 when it offers no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action").  For both of the above reasons, plaintiffs' negligence claims will be dismissed.

### B.    Fraud

Plaintiffs allege that defendants fraudulently provided inaccurate or incomplete data regarding their wellbore interests, causing damages.  Dkt. 49 at 18 ¶ 46.  Common-law fraud in Texas requires proof of "(1) a misrepresentation that (2) the speaker knew to be false or made recklessly (3) with the intention to induce the plaintiff's reliance, followed by (4) actual and justifiable reliance (5) causing injury."  *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 620 F.3d 465, 468 (5th Cir. 2010) (citing *Ernst & Young, LLP v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)).  Fraud claims in federal court are subject to the heightened pleading requirements of Rule 9(b): "[A] party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  FED. R. CIV. P. 9(b).  This circuit strictly interprets Rule 9(b), requiring the plaintiff "to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."  *Williams*, 112 F.3d at 177.

The plaintiffs' fraud claims must be dismissed because they have failed to properly allege fraudulent intent.  While knowledge may be pled generally, the plaintiffs must do more than simply state that statements were knowingly false when made or made with reckless disregard of the truth.  Such allegations are legal conclusions and not well-pled facts.  *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) (explaining that plaintiffs "must set forth specific *facts* to support

an inference of fraud"). Here, plaintiffs have made bare assertions that defendants reported data to the Railroad Commission inconsistent with data that plaintiffs received. Dkt. 49 at 10–11 ¶ 30. Assuming this allegation is true, as the court must when considering a 12(b)(6) motion to dismiss, it does not show that the discrepancy was intentional or reckless. Plaintiffs have failed to plead a plausible claim for common-law fraud, and these claims will be dismissed.

### C.      Breach of Fiduciary Duty

Plaintiffs next contend that defendants breached fiduciary duties owed as operators to non-operator working interest owners. Dkt. 49 at 16–17 ¶¶ 41–44. Plaintiffs allege that three fiduciary relationships exist and were breached in this case: (1) a trustee/agency relationship; (2) a joint venture; and (3) an informal fiduciary relationship. Dkt. 49 at 16–17 ¶¶ 41, 43. However, because Texas law does not recognize any of these three relationships as applied in this case, plaintiffs' claims for breach of fiduciary duty may not proceed.

First, plaintiffs' live complaint states that defendants "owed a limited fiduciary duty to Plaintiffs based on trustee-type and agency relationships where they received payment of Plaintiffs' share of revenue from a purchaser, or Defendants received from Plaintiffs payment, in advance, of Plaintiffs [sic] share of costs for an approved operation." Dkt. 49 at 16–17 ¶ 41. While plaintiffs argue in response to the motion to dismiss that this trustee-type fiduciary duty is found in secondary sources on oil and gas law, they have not pointed to any cases applying Texas law that would be binding on this court. Dkt. 53 at 14–15. Further, the principal case to support such a duty is from the Tenth Circuit Court of Appeals, *Reserve Oil, Inc. v. Dixon*, 711 F.2d 951, 953 (10th Cir. 1983), and its unusual application of trust principles to a joint operating relationship like the one here has been criticized by a sister court as inconsistent with Texas contract law. *See Wilson v. TXO Prod.*

9

*Corp. (In re Wilson)*, 69 B.R. 960, 964–65 (Bankr. N.D. Tex. 1987) ("[I]t seems clear that Texas Courts would hold that an operating agreement does not create a trustee-type relationship between an operator and the non-operators.") (citing *Luling Oil & Gas Co. v. Humble Oil & Ref. Co.*, 191 S.W.2d 716, 722–23 (Tex. 1945) (dismissing the comparison of trust principles to the operation of jointly owned oil and gas and leases and finding that "[a] breach of the agreement by either corporation is a simple breach of a written contract and the law governing the rights incident thereto is controlled by the law of contracts.")).  Plaintiffs therefore cannot show a breach of fiduciary duty based on a trustee/agency relationship in this case.

Second, plaintiffs plead that the E&D Agreement and the Operating Agreement give rise to a joint venture between the operator and non-operators.  Dkt. 49 at 17 ¶ 43.  The elements of a joint venture under Texas law are as follows: (1) a mutual right of control; (2) community interest; (3) the sharing of profits as principals, and (4) the sharing of losses, costs, or expenses.  *Taylor v. GWR Operating Co.*, 820 S.W.2d 908, 911 (Tex. App.—Houston [1st Dist.] 1991, writ denied).  Plaintiffs argue that an unpublished decision from the Houston court of appeals supports the imposition of a joint venture.  Dkt. 53 at 15 (citing *Aero Energy Inc. v. Circle C Drilling Co.*, No. 01-83-0647-CV, 1984 Tex. App. LEXIS 6627 (Tex. App.—Houston [1st Dist.] Nov. 1, 1984)).  *Aero Energy* is inapposite, however, because the court in that case found a mutual right of control in the enterprise covered by the agreement.  *Id.* at *10.  The Operating Agreement here, by contrast, states that the defendants "shall be the Operator of the Contract Area, and shall conduct and direct and have *full control* of all operations on the Contract Area . . . ."  Dkt. 49, Ex. 1 at 16 § V(A) (emphasis added); *see also Castle Tex. Prod. Ltd. P'ship v. Long Trusts*, 134 S.W.3d 267, 277–78 (Tex. App.—Tyler 2003, pet. denied) (holding that this contract language precludes a finding of a mutual right of

10

control because the operator maintains plenary power on the Contract Area).  Without mutual control rights, the Operating Agreement does not create a joint venture under Texas law.

Third, plaintiffs plead that the Operating Agreement created an informal fiduciary relationship.  Dkt. 49 at 17 ¶ 43.  An "informal" fiduciary relationship can arise "from a moral, social, domestic or purely personal relationship of trust and confidence, but to impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to and apart from the agreement made the basis of the suit."  *Anglo-Dutch Petroleum Int'l, Inc. v. Smith*, 243 S.W.3d 776, 781 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *see also Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005).  Whether such a duty exists depends on the circumstances.  *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).  Plaintiffs have pled no facts indicating any preexisting relationship among the operator and non-operators in this case.  Accordingly, plaintiffs' complaint does not support a claim for breach of a fiduciary duty arising from an informal fiduciary relationship.

Without any facts supporting the existence of a formal or informal fiduciary duty, the plaintiffs' breach of fiduciary duty claims will also be dismissed.

### D.   *Accounting*

Plaintiffs request an equitable accounting to determine defendants' liability to plaintiffs under the contracts, and plaintiffs seek equitable relief on grounds that no adequate remedy at law is available.  Dkt. 49 at 15 ¶ 37.  An equitable accounting is proper when the facts and accounts presented "are so complex that adequate relief may not be obtained at law."  *T.F.W. Mgmt., Inc. v. Westwood Shores Prop. Owners Ass'n*, 79 S.W.3d 712, 717 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).  When a party can obtain adequate relief through standard discovery procedures,

11

including requests for production and interrogatories, the district court does not err by denying an equitable accounting. *Id.* at 717–18. Here, plaintiffs have pled no facts showing that the revenue calculations under the contractual accounting mechanisms are of sufficient complexity to merit equitable relief. Accordingly, plaintiffs' claim for an accounting will be dismissed.

### E.      Gross Negligence/Willful Misconduct

Plaintiffs plead that, to the extent defendants assert the protections of the Operating Agreement's exculpatory clause under Section V(A), the defendants' alleged malfeasance constitutes gross negligence or willful misconduct. Dkt. 49 at 17 ¶ 45. Defendants move to dismiss this purported claim on grounds that plaintiffs cannot show the type of harm that rises to the level of gross negligence or willful misconduct. Dkt. 51 at 19–20. The court agrees with the defendants that the claim should be dismissed, but on different grounds described below.

The threshold question for the court is whether the Operating Agreement's exculpatory clause should bar or limit plaintiffs' claims in these circumstances. Under the 1977 and 1982 Model Form Operating Agreements, similar to the parties' Operating Agreement here, the exculpatory clause specifies that the operator "shall conduct and direct and have full control of all operations on the Contract Area" and "shall conduct *all such operations* in a good and workmanlike manner . . . ." *Reeder v. Wood Cnty. Energy, LLC*, 395 S.W.3d 789, 794 (Tex. 2012) (emphasis added). The Texas intermediate appellate courts have uniformly found that the phrase "all such operations" referred back to "operations on the Contract Area," and held that the exculpatory clause was limited to the operator's activities at the wellsite and did not extend to other breaches of the agreement. *See Long Trusts*, 134 S.W.3d at 282–83; *IP Petroleum Co. v. Wevanco Energy, LLC*, 116 S.W.3d 888, 895 (Tex. App.—Houston [1st Dist.] 2003, pet. denied); *Cone v. Fagadau Energy Corp.*, 68 S.W.3d 147, 155 (Tex. App.—Eastland 2001, pet. denied); *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d

741, 759 (Tex. App.—El Paso 2000, no pet.).  The *Abraxas* court explained that "the operator's limitation of liability is linked directly to imposition of the duty to act as a reasonably prudent operator, which strictly concerns the manner in which the operator conducts drilling operations on the lease." *Abraxas*, 20 S.W.3d at 759.  These cases implicitly rejected a prior Fifth Circuit decision holding that the 1977 and 1982 exculpatory clause extends to any action performed by the operator under its authority from the JOA, including failures to account to working interest holders.  *See Stine v. Marathon Oil Co.*, 976 F.2d 254, 260–61 (5th Cir. 1992).

In 1989, the Model Form Operating Agreement's exculpatory clause dropped the reference to "all such operations" and substituted the phrase "activities under this agreement."  A.A.P.L. Form 610, Model Form Operating Agreement-1989, American Association of Petroleum Landmen.  Legal Commentators viewed this change as material, arguing that the A.A.P.L. intended that "activities under this agreement" should extend to all contractual obligations, not just those performed by the operator in the field.  *See* Robert C. Bledsoe, *The Operating Agreement: Matters Not Covered or Inadequately Covered*, 47 ROCKY MTN. MIN. L. INST. § 15.03[1] (2001) ("By way of contrast, the 1982 Form and prior forms differ markedly . . . .  Because 'such operations' refers to operations on the Contract Area, the 1989 Form provides for more expansive exoneration of the Operator.").  In 2012, the Texas Supreme Court took up the issue and agreed with the commentators that the 1989 exculpatory clause addressed a broader swathe of conduct than previous versions: "[T]he parties modeled their JOA after the 1989 model form—recognizing the distinction between 'such operations' and 'its activities.'  The modifier 'such' references operations under the JOA, while the deletion of that word and use of the term 'its activities' includes actions under the JOA that are not limited to operations.  The modification implicates a broader scope of conduct following the language of the contract." *Reeder*, 395 S.W.3d at 795.  This quoted language demonstrates a clear

departure from *Stine*'s reasoning and agreement with the courts of appeals that had imposed a restrictive interpretation of the previous exculpatory clause.

In a diversity case, this court must apply state law as construed by the state's court of last resort. *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 420–21 (5th Cir. 2001) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817 (1938)).   This court is ordinarily bound by the Fifth Circuit's interpretation of state law, "unless a subsequent state court decision . . . renders [the Fifth Circuit's] prior decision clearly wrong." *Id.*  The court concludes that *Reeder* clearly abrogates *Stine*, and the court defers to the Texas Supreme Court's construction of state law.  Plaintiffs' allegations in this case are limited to accounting breaches and do not concern defendants' conduct as the well operator in the Barnett Shale Prospect Area.  The exculpatory clause of the Operator Agreement thus does not apply, and the plaintiffs' purported gross negligence/willful misconduct claim will be dismissed.

### F.     Breach of Contract

Lastly, plaintiffs allege that defendants' conduct described above violated several provisions of the E&D Agreement and Operating Agreement, causing them to suffer out-of-pocket, expectation, and impairment of vendibility damages.  Dkt. 49 at 13–15 ¶¶ 32–36.  Defendants move to dismiss several contract claims on three principal grounds: (1) the E&D Agreement has terminated and no longer binds the parties; (2) the defendants are not obligated to provide a "development plan or acreage maps" to the plaintiffs; and (3) the plaintiffs cannot recover for the impairment of the wellbore interests' value because plaintiffs did not plead the loss of a specific sale.  Dkt. 51.

1.      **The E&D Agreement**

The E&D Agreement contains clear language regarding its temporal scope:

> This Agreement shall be effective as of March 1, 2005 and continue thereafter for a period of three (3) years.  This Agreement shall terminate on March 1, 2008, unless terminated at an earlier date pursuant to the terms hereof or by mutual agreement of all parties hereto.  Thereafter, any jointly owned wells, leases and units then producing or being drilled in the Barnett Shale Prospect Area shall continue to be subject to the governing Operating Agreement for each proration and/or pooled unit separately until the expiration of such Operating Agreement.

Dkt. 49, Ex. 1 at 1 § III.  In a subsequent provision, the E&D Agreement sheds further light on its relationship with the operating agreements, stating that "[a]fter termination of this agreement, each separate operating agreement so executed shall stand independent of each other and apply to all wells drilled hereunder."  *Id.* at 5 § VII.  The Operating Agreement in turn contains a conflicts provision stating: "This Operating Agreement is subject to and incorporates by reference all terms and provisions of that certain Exploration and Development Agreement between these same parties dated effective March 1, 2005."  *Id.* at 28 § XV(H).

The court may construe a contract as a matter of law when its language provides a "'certain or definite legal meaning or interpretation'" that removes any ambiguity regarding the parties' intent. *Kern v. Sitel Corp.*, 517 F.3d 306, 309 (5th Cir. 2008) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)).  The court should "consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless."  *Coker*, 650 S.W.2d at 393 (emphasis in original); *see also J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).  When a contract incorporates another instrument's terms through a clear statement of such intent, the court must construe both instruments together.  *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 267 (5th Cir. 2011).

15

The court has reviewed the terms of the E&D and Operating Agreements as an integrated contract.  Based on this review, the court finds that the parties clearly intended that their contractual obligations be divided into two phases: (1) on or before March 1, 2008, when their conduct was governed by the E&D Agreement and operating agreements that covered proposed or existing wells within the Barnett Shale Prospect Area; and (2) after March 1, 2008, when their conduct is governed by "each separate operating agreement" that applies to drilled wells within the Exploration and Development Areas.  Dkt. 49, Ex. 1 at 5 § VII.

Plaintiffs do not dispute that the E&D Agreement terminated on March 1, 2008; rather, plaintiffs contend that the Operating Agreement's incorporation language preserves the E&D Agreement's obligations until the termination of the separate operating agreements.  Dkt. 49 at 5 ¶ 16.  After careful consideration of the agreements, the court rejects this contention because it does not give full effect to the incorporation provision.  The operating agreements incorporated "all terms and provisions" of the E&D Agreement, and the most natural reading of this provision is that the E&D Agreement's application is coterminous with each operating agreement until the E&D Agreement expired on March 1, 2008, as the termination date is also an incorporated provision. Thereafter, the only source of contractual obligations among the parties is the Operating Agreement. Plaintiffs acquired their wellbore interests sometime after June 2008, and thus their claims regarding subsequent contractual breaches can only arise under the extant operating agreements.

**2.      Development Plan and Acreage Maps**

Plaintiffs state that they requested a development plan and acreage maps from defendants, which defendants were allegedly required to provide but failed to do so.  Dkt. 49 at 6 ¶¶ 21–22. Because the E&D Agreement no longer applied after March 1, 2008, the only basis for a contractual obligation to provide this data to plaintiffs is the Operating Agreement.  Specifically, plaintiffs cite

Article VI(D), which provides non-operators a right of access to the Contract Area and "information pertaining to the development or operation thereof." Plaintiffs argue that covered information includes the overall development plan and acreage maps. Dkt. 49 at 6 ¶ 22. Defendants respond that the Operating Agreement applies only to disclosure of data obtained during actual operations and production, not planning documents. Dkt. 51 at 18. The court agrees with the defendants.

The E&D Agreement contemplated the creation of one or more "Exploration and Development Area[s]" within the larger Barnett Shale Prospect Area. Dkt. 49, Ex. 1 at § 6.1. The E&D Areas were to be established after the disclosure of an agreed drilling plan and acreage maps. *Id.* (providing CG the reciprocal right, upon its objection to CELP's drilling plan, to disclose "a plat of its own alternative proposed Exploration and Development Area(s) and drilling plan for the prospect"). The court reads this provision to mean that disclosure of the drilling plan and acreage maps was a condition precedent to actual exploration and development of E&D Areas.

Then, once operations were underway, the non-operators could access the "Contract Area" and obtain "information pertaining to the development or operation thereof, including Operator's books and records relating thereto." Dkt. 49, Ex. 1 at 20 § VI(D). The development data was thus limited by the terms "thereof" and "thereto" to be that data regarding development and operation of the "Contract Area." That term is limited to the lands and leasehold interests covered by each operating agreement, not the larger area of interest under the E&D Agreement, and by implication applies to actual drilling operations. *See id.* at 13 § 1(D); *see also id.* at 5 § VII (provision within the E&D Agreement specifying that "[a]ll *operations* in the Barnett Shale Prospect Area shall be governed . . . by the terms and conditions of the [Operating Agreement]. A separate Operating Agreement shall cover each Exploration and Development Area . . . .") (emphasis added). The operator was therefore obliged to provide non-operators with certain data relating to actual

operations and production as to each particular E&D Area that was being developed.   This contractual language does not support plaintiffs' construction, which assumes a broader disclosure duty of overall pre-development plans and acreage maps for the zone of geological interest within the Barnett Shale Prospect Area.   As explained above, that expansive duty logically comes within the E&D Agreement, not within the more focused Operating Agreement.

The court thus holds that defendants owed no duty to disclose development plans and acreage maps to plaintiffs, and the plaintiffs' claim for "Breach of Contract — Development Information" will be dismissed.   *See Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 769–70 (Tex. App.—Dallas 2005, pet. denied) ("A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform.").

### 3.   Loss of a Specific Sale

Plaintiffs allege that defendants' failure to provide development information "deprived Plaintiffs of information needed for their Wellbore Interests to be marketable."   Dkt. 49 at 13–14 ¶ 33.   Defendants assert that plaintiffs cannot recover for the loss of their interests' value because they have not pled the loss of a specific sale.   Dkt. 51 at 20–21.   Plaintiffs respond that a showing of a lost sale is only required to plead a slander of title claim, not breach of contract.   Dkt. 53 at 20–22.   The court need not decide this issue, however, because plaintiffs' only claim for breach of contract that seeks impairment of vendibility damages is its claim for inadequate development information, a claim which the court has already dismissed.   *See* Part III.F.2, *supra*.

### 4.   Breach of Contract Summary

Plaintiffs cannot state a claim for breach of the E&D Agreement, nor can they recover out-of-pocket or impairment of vendibility damages under the Operating Agreement relating to defendants' purported failure to disclose the development plan and acreage maps.   Nonetheless, the court finds

that plaintiffs have stated a plausible claim for breach of contract relating to the delayed look-back elections, erroneous JIBs, underpayments of proceeds, and improper production charges.  Dkt. 49 at 13–15 ¶¶ 34–36.  Plaintiffs' alleged losses are limited to expectancy damages in the form of financial underpayments of monies owed and overcharges of production costs.  *See id.* at 14 ¶ 34 ("As a result of Defendants' breach of contract, . . . the Plaintiffs have sustained financial harm in the amount of the payments that were not paid due to the delay in crediting the elections."); *id.* at 14–15 ¶ 35 ("As a result of Defendants' breach of contract, . . . the Plaintiffs have sustained financial harm in the amount of the net [JIB] errors in Defendants' favor."); *id.* at 15 ¶ 36 ("As a result of Defendants' breach of contract, . . . the Plaintiffs have sustained financial harm in the amount of the underpayments [due to misstated charges and well interests].").

## IV. Conclusion

The defendants' motion to dismiss (Dkt. 51) is **GRANTED IN PART & DENIED IN PART**.  Plaintiffs' allegations do not state plausible tort and equitable claims for relief, and those claims are **DISMISSED WITH PREJUDICE**.  Plaintiffs' claim for "Breach of Contract — Development Information" rests on a contractual duty that the defendants do not owe to the plaintiffs, and that claim is **DISMISSED WITH PREJUDICE**.  Plaintiffs may proceed beyond the pleadings stage with their remaining breach of contract claims.  *See* Dkt. 49 at 13–15 ¶¶ 34–36.

It is so **ORDERED**.

Signed at Houston, Texas on February 14, 2014.

Gray H. Miller
United States District Judge